UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-

MODERN GAMING, INC.

              Plaintiff,

v.

SOCKEYE SOFTWARE, LLC, and
EMPIRE TECHNOLOGICAL GROUP, LTD.,

              Defendants.

---

## COMPLAINT AND JURY DEMAND

Plaintiff Modern Gaming, Inc. ("Modern") brings this case due to Defendants Sockeye Software, LLC ("Sockeye") and Empire Technological Group, Ltd.'s ("Empire" and, together with Sockeye, "Defendants") unlawful scheme to terminate Modern's contract with Sockeye, provide Empire with Modern's exclusive right to license Sockeye's software, and interfere with Modern's hard-earned customer relationships. Modern alleges as follows:

### INTRODUCTION

1.      On December 1, 2019, Modern and Sockeye entered into a License Agreement that granted Modern an exclusive license to use Sockeye's Platform Development Software in Modern's computerized slot machines ("gaming devices") in certain states. (License Agreement, Ex. A.) The License Agreement had an initial seven-year term that automatically renewed for successive one-year terms. Modern and Sockeye could terminate the License Agreement only for cause or by mutual agreement of the parties.

2.      In reliance on the exclusivity Modern obtained through the License Agreement, Modern invested significant time and resources in developing gaming devices for use in its exclusive territories. Specifically, Modern (i) helped Sockeye develop game-specific software utilizing Sockeye's underlying Platform Development Software; (ii) manufactured the hardware on which the parties installed the game-specific software; (iii) obtained approval from the certified testing lab for use of the product in each of Modern's exclusive territories; (iv) engaged in discussions with distributors and casinos in those territories to market the gaming devices; and (v) entered into an agreement to place gaming devices in a major casino in Oklahoma, among other investments.

3.      Beginning no later than December 2021—while Modern was continuing to develop, market, and place gaming devices under the License Agreement—Defendants secretly began formulating a plan for Sockeye to terminate the License Agreement and divert Modern's exclusivity rights to Empire.

4.      In furtherance of this scheme, Sockeye unilaterally and without cause terminated the License Agreement on March 14, 2022, so it could "evolve [its] partnership with a new company that can provide Sockeye an influx of capital." Defendants also informed Modern's existing and prospective customers that Empire would replace Modern as the manufacturer and distributor of gaming devices containing Sockeye's software.

5.      As a result of Defendants' unlawful conduct, Modern has suffered significant damages, including but not limited to, loss of the investment Modern made to develop gaming devices using Sockeye's Platform Development Software, loss of profit, and reputational harm.

6.    Modern files this case to recover for the significant harm that Defendants' conduct has caused.

## THE PARTIES

7.    Modern is a Louisiana corporation with its principal place of business located at 20415 LA Highway 16, Denham Springs, LA 70726.

8.    Defendant Sockeye Software, LLC is a Colorado limited liability company with its principal place of business located at 12726 W. 85th Circle, Arvada, CO 80005.

9.    Defendant Empire Technological Group is a Nevada corporation with its principal place of business located at 7175 West Post Road, Las Vegas, NV 89113.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(a) because this lawsuit involves entities of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11.    Modern is a corporation organized and existing under the laws of Louisiana with its principal place of business located in Louisiana, and is, therefore, a citizen of Louisiana for purposes of diversity jurisdiction.

12.    Sockeye is a limited liability company with one member: Todd Seymour, who is domiciled in Colorado. Therefore, Sockeye is a citizen of Colorado for purposes of diversity jurisdiction. None of Sockeye's members are citizens of Louisiana. Thus, Sockeye is not a citizen of Louisiana for purposes of diversity jurisdiction.

13.     Empire is a corporation organized and existing under the laws of Nevada with its principal place of business located in Nevada, and is, therefore, a citizen of Nevada for purposes of diversity jurisdiction.

14.     Modern seeks damages well in excess of $75,000 due to Defendants' unlawful conduct.

15.     This Court has general personal jurisdiction over Sockeye because Sockeye maintains its principal place of business in Colorado and is therefore at home in Colorado for purposes of general personal jurisdiction.

16.     This Court has specific personal jurisdiction over Empire because Empire intentionally induced a Colorado company to breach a contract in Colorado. The contract with which Empire tortiously interfered—and of which Empire was aware—applies Colorado law and was performed by Sockeye entirely in Colorado. By conducting tortious activity aimed at Colorado, Empire could reasonably anticipate being sued in Colorado.

17.     Venue in this district is proper in accordance with 28 U.S.C § 1391(b)(2), because Empire induced Sockeye to breach a Colorado contract in Colorado. Alternatively, venue is proper under 28 U.S.C. § 1391(b)(3) because Defendants are subject to personal jurisdiction in Colorado.

## FACTUAL ALLEGATIONS

### A.     The Parties' Roles in the Computerized Gaming Industry

18.     Modern, Sockeye, and Empire do business in the computerized gaming industry, both in Class II and Class III gaming.

19.     Class II gaming refers to games that are based off the game of chance commonly known as bingo and other non-banked card games—i.e., games where two or more players play against each other instead of the house. Class III gaming refers to traditional, casino-style gambling.

20.     Class II gaming presents regulatory advantages and efficiencies to tribes operating casinos because, unlike with Class III gaming, tribes generally do not need to enter into a tribal-state gaming compact to conduct Class II gaming.

21.     Modern manufactures and distributes electronic gaming hardware and devices— until 2019, primarily in Class III gaming jurisdictions. That is, Modern manufactures the physical "cabinets" on which gaming software is installed and then distributes those cabinets to casinos in the jurisdictions in which it operates.

22.     Like Modern, Empire manufactures and distributes electronic gaming hardware and devices. Empire operates in both Class II and Class III gaming jurisdictions.

23.     In contrast, Sockeye develops computerized gaming software for Class II and Class III gaming applications. Relevant here, Sockeye developed a Platform Development Software, which refers to the underlying Class II mathematical formulation on which a variety of specific gaming applications can be based.

**B.     Modern and Sockeye Execute the License Agreement**

24.     In late-2018, Sockeye and Modern began discussing an agreement between the companies that would allow Modern to expand its presence in the Class II gaming market and allow Sockeye to benefit from Modern's expertise in the gaming industry.

25.     In furtherance of those discussions, Modern and Sockeye entered into the License Agreement effective December 1, 2019.

26.     The License Agreement provided Modern with a competitive advantage to develop its business in the Class II gaming market in Modern's exclusive territories.

27.     The License Agreement granted Modern an "exclusive license" to use Sockeye's Class II Platform Development Software in gaming devices in Florida, Alabama, New York, and Louisiana. (License Agreement 1, Ex. A.)

28.     In return for Modern's exclusive license in these territories, Modern agreed to pay Sockeye a quarterly licensing fee of $9.00 per day for each gaming device that Modern placed in any casino or other location. (*Id.* §§ 1.24, 3.)

29.     The License Agreement had an initial seven-year term, after which it automatically renewed for successive terms of one year each. (*Id.* § 4.)

30.     The License Agreement allowed either party to terminate the agreement only for four specified reasons:

a)      "If the other party fails to or refuses to pay any amount due hereunder for more than thirty (30) days after written notice was provided stating the amount due";

b)      "For any material breach of this Agreement by either Party of any provision of this Agreement and fails to cure such breach within thirty (30) days after receipt of such breach";

c)      "If the other Party becomes insolvent or is the subject of any legal insolvency proceeding"; or

       d)     "By mutual agreement of the parties."

(*Id.* § 5.)

31.     On February 24, 2021, Sockeye and Modern amended the License Agreement effective January 18, 2021 to include North Carolina and the Chickasaw Nation in Oklahoma as additional territories in which Modern had exclusive licensing rights. (License Agreement Amendment, Ex. B.)

32.     Modern expected to place the most gaming devices under the License Agreement in Oklahoma, New York, and Alabama. Modern and Sockeye added Louisiana to the list of exclusive territories only because Modern had a pre-existing relationship with a single casino in Louisiana.

**C.**     **Modern Invests Substantial Resources in Developing Business in the Exclusive Territories**

33.     After Modern and Sockeye executed the License Agreement, Modern began investing significant time and resources into developing gaming devices under the License Agreement.

34.     Beginning in late-2019, Modern worked closely with Sockeye to help Sockeye improve a Class II video poker software based on Sockeye's Platform Development Software. Modern provided Sockeye with the expertise and experience Modern had developed in the Louisiana video poker market to help Sockeye advance its Platform Development Software into a more user-friendly poker software that could be installed in Modern's cabinets. Modern also leveraged its expertise to refine and further develop marketing materials and sales strategies for the product.

35.     As a result of Modern's efforts and expertise, Sockeye and Modern developed "Big Bear Poker," which is a Class II game that simulates traditional Class III video poker. At the time of its creation, Big Bear Poker was the only Class II video poker game available. Accordingly, a significant market existed for Big Bear Poker.

36.     Modern also assisted Sockeye with developing game-specific software for other Class II games based on Sockeye's Platform Development Software.

37.     From late-2019 through spring of 2022, Modern invested substantial resources in developing a market for Big Bear Poker and other Class II games in its exclusive territories. Specifically, Modern registered its business in multiple states; obtained approval from the certified independent testing lab for use of the product in each of Modern's exclusive territories; submitted gaming licensing applications and substantially completed the Chickasaw Nation's approval process in Oklahoma; manufactured gaming cabinets; assisted Sockeye with mandatory testing of game-specific software and gaming devices and other requirements necessary to obtain regulatory approval in the exclusive territories; and developed relationships and had negotiations with prospective customers in Oklahoma, Alabama, New York, and Louisiana to market Modern's Class II gaming devices, among other efforts.

38.     Further, in the fall of 2022, Modern finalized its agreement with one of the primary gaming device distributors in Oklahoma—A&W Enterprises. Pursuant to its distributorship agreement with A&W Enterprises, Modern was authorized to place an initial eight to ten Big Bear Poker devices at the Winstar World Casino and Resort in Oklahoma in October 2021.

39.     The Winstar casino is the largest casino in the United States, and therefore, presented a significant opportunity for Modern to expand its presence in the Class II gaming market.

**D.     Defendants Develop a Scheme to Breach the License Agreement and Interfere with Modern's Exclusivity Rights**

40.     While the License Agreement was still in effect, and initially unbeknownst to Modern, Sockeye began devising a scheme with Empire to interfere with Modern's exclusivity rights.

41.     On December 16, 2021, Sockeye emailed Empire proposed terms that allowed Empire to obtain Modern's exclusive licensing rights over Sockeye's Platform Development Software. The email stated that Sockeye is "excited to become [Empire's] partner in driving [Empire's] business and revenue in both the Class II and Class III space with our proprietary platform, IP and niche games." In this same email, Sockeye informed Empire of its "contract with Modern Gaming for 5 states," stated that Modern had gaming devices "in a Chickasaw casino," and indicated that Empire would be "responsible for [the] Modern Gaming buyout."

42.     Throughout the first quarter of 2022, Sockeye sent additional correspondence to Empire that informed Empire of Sockeye's agreement with Modern and the need to negotiate an "exit strategy" with Modern. Empire was therefore well aware of Modern's contractual exclusivity rights and Sockeye's inability to terminate those rights without Modern's consent.

43.     Despite this knowledge, Defendants did not obtain Modern's consent to provide Empire with Modern's contractually guaranteed exclusivity rights.

44.     To the contrary, without Modern's consent, Empire began contacting Modern's existing and prospective customers in Modern's exclusive territories to market Empire's own gaming devices that utilized Sockeye's Platform Development Software.

**E.     Sockeye Unlawfully Terminates the License Agreement**

45.     Then, on March 14, 2022, Sockeye sent correspondence to Modern dated February 23, 2022, purporting to unilaterally terminate the License Agreement. (Termination Letter, Ex. C.) Sockeye's sole basis for its termination was that Sockeye wished "to evolve [its] partnership with a new company that can provide Sockeye an influx of capital to cover monthly overhead to survive in addition to other revenue streams." (*Id.*) Sockeye further noted that it had proposed an option for Modern to invest in Sockeye, which Modern had declined.

46.     Nothing in the License Agreement required Modern to provide Sockeye with "an influx of capital," nor did Sockeye otherwise claim Modern had breached any obligation under the License Agreement. Accordingly, Sockeye breached the License Agreement when it terminated the Agreement.

47.     Shortly after Sockeye's wrongful termination of the License Agreement, Defendants began emailing announcements to Modern's customers and clients, including A&W Enterprises, to advise them that Empire will be "managing, manufacturing [Sockeye's] cabinets, and distributing [Sockeye's] Class II skill-based Big Bear Poker and other forthcoming Class II games." This correspondence touted Empire's "national footprint" and noted that Sockeye would no longer be doing business with Modern.

48.     Thus, after Modern had invested significant resources in developing its Class II gaming devices and relationships with customers—and just as Modern was set to begin profiting

from that investment—Sockeye unlawfully terminated the License Agreement and left Modern unable to earn any return on its investment.

49.     As a result of Sockeye's unlawful termination of the License Agreement, and Empire's tortious interference, Modern has suffered significant damages, including but not limited to, loss of the investment Modern made to develop and bring to market gaming devices using Sockeye's Platform Development Software, loss of profit, and reputational harm.

**FIRST CLAIM FOR RELIEF**
**Breach of Contract Against Sockeye**

50.     Modern incorporates all of the foregoing paragraphs by reference as if fully set forth herein.

51.     The License Agreement constitutes a valid and binding contract between Modern and Sockeye.

52.     Sockeye breached the License Agreement by unilaterally terminating the agreement while it was in effect for a reason other than that permitted by the agreement. Sockeye terminated the License Agreement because Sockeye wished to develop a partnership with Empire and because Empire was willing to provide Sockeye an "influx of capital." The License Agreement did not allow Sockeye to terminate the agreement on these grounds.

53.     Modern has performed all of its obligations under the License Agreement.

54.     As a result of Sockeye's breach of the License Agreement, Modern has sustained damages in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### Promissory Estoppel Against Sockeye – Alternative Theory of Liability

55.     Modern incorporates all of the foregoing paragraphs by reference as if fully set forth herein.

56.     Sockeye promised Modern that Modern would have exclusive rights to use and develop Sockeye's Platform Development Software in Florida, Alabama, New York, Louisiana, North Carolina, and the Chickasaw Nation in Oklahoma.

57.     Sockeye should reasonably have expected that its promises would induce action and reliance by Modern.

58.     Modern, in fact, did reasonably rely on Sockeye's promise to its detriment by, among other things, investing significant time, resources, and expertise into developing and marketing its gaming devices with Sockeye's Platform Development Software.

59.     Sockeye failed to honor its promise by terminating Modern's exclusivity in the aforementioned states and instead providing Empire with exclusive rights over its software.

60.     Modern has suffered damages in an amount to be proven at trial as a result of Sockeye's failed promises.

61.     Sockeye's promise to provide Modern exclusivity must be enforced to prevent injustice.

## THIRD CLAIM FOR RELIEF
### Civil Conspiracy Against Sockeye and Empire

62.     Modern incorporates all of the foregoing paragraphs by reference as if fully set forth herein.

63.     Defendants had a meeting of the minds to accomplish the unlawful acts of interfering with Modern's existing and prospective business relationships and providing Empire with Modern's exclusive rights to license Sockeye's software in certain states.

64.     Acting in furtherance of the conspiracy, Defendants contacted Modern's existing and prospective customers to inform them that Modern would no longer be the manufacturer and distributor for Sockeye's Class II games. Defendants further informed Modern's existing and prospective customers that, going forward, Empire would manufacture and distribute Sockeye's Class II games.

65.     The civil conspiracy between Defendants caused damage to Modern.

### FOURTH CLAIM FOR RELIEF
### Tortious Interference with Contract Against Empire

66.     Modern incorporates all of the foregoing paragraphs by reference as if fully set forth herein.

67.     The License Agreement was a valid and enforceable contract that existed between Modern and Sockeye.

68.     While the License Agreement was in effect, Empire intentionally induced Sockeye to breach the agreement and divert Modern's contractual exclusivity rights to Empire.

69.     At the time of Empire's tortious conduct, Empire was aware of the License Agreement, the exclusivity rights provided to Modern under the License Agreement, and Sockeye's inability to terminate the License Agreement without Modern's consent.

70.     Empire's interference was malicious and wrongful and was neither justified, privileged, nor excusable. Empire was aware of Modern's exclusivity rights at the time it caused Sockeye to breach the License Agreement, and it was aware that the agreement was not

terminable at will. Empire nevertheless convinced Sockeye to breach the License Agreement for the purpose of obtaining its own exclusive rights to license Sockeye's software in Modern's territories.

71.     Modern has sustained damages as a result of Empire's tortious interference with the License Agreement, including but not limited to, loss of the investment Modern made to develop gaming devices using Sockeye's Platform Development Software, loss of profit, and reputational harm.

**FIFTH CLAIM FOR RELIEF**
**Tortious Interference with Economic Advantage Against Empire**

72.     Modern incorporates all of the foregoing paragraphs by reference as if fully set forth herein.

73.     Modern had an existing business relationship with A&W and Winstar World Casino and Resort in Oklahoma. Further, Modern had a prospective business relationship with other casinos in Modern's exclusive territories, including but not limited to, Poarch Creek casino in Alabama.

74.     Empire was aware of Modern's existing and prospective business relationships, as Sockeye had informed Empire of Modern's exclusivity rights and Modern's corresponding business relationships.

75.     Despite its knowledge, Empire sought to cause Modern's existing and prospective customers to terminate their relationships with Modern and transfer their business to Empire. Specifically, Empire engaged in an unlawful scheme with Sockeye to become Sockeye's exclusive manufacturer and distributor in Modern's territories. In furtherance of that scheme, Empire contacted Modern's customers in Modern's exclusive territory to market Empire's own

gaming devices utilizing Sockeye's Platform Development Software. Further, Defendants informed Modern's existing and prospective customers that Empire would be Sockeye's new manufacturer and distributor of Class II games.

76.     Empire employed wrongful means in its interference with Modern's business relationships. Indeed, Empire engaged in this conduct despite knowing that Modern had an exclusive contractual right to license Sockeye's software in the territory of those businesses.

77.     Modern has sustained damages as a result of Empire's tortious interference with Modern's business relationships, including but not limited to, the loss of relationships with A&W Enterprises, Winstar World Casino and Resort, and prospective customers.

## RESERVATION

Modern reserves the right to amend its Complaint to add allegations, claims, or remedies that may be developed through further investigation and discovery.

## PRAYER FOR RELIEF

Modern respectfully requests that the Court award the following relief against Defendants:

1.     Monetary damages in an amount to be proven at trial;

2.     Attorneys' fees as allowed under the License Agreement and as otherwise permitted by law;

3.     The costs of this action as permitted by law;

4.     Pre-judgment and post-judgment interest; and

5.     Such other or further relief this Court deems proper.

## DEMAND FOR JURY TRIAL

Modern demands a trial by jury on all claims so triable.


Dated:  June 21, 2023                    Respectfully submitted,


                                         *s/ Kathryn A. Reilly*
                                         Kathryn A. Reilly
                                         Jacob A. Rey
                                         Wheeler Trigg O'Donnell LLP
                                         370 Seventeenth Street, Suite 4500
                                         Denver, CO 80202
                                         Telephone:   303.244.1800
                                         Facsimile:   303.244.1879
                                         Email:   reilly@wtotrial.com
                                                   rey@wtotrial.com

                                         *Attorneys for Plaintiff*