IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 23-cv-01583-PAB-STV

MODERN GAMING, INC.,

     Plaintiff,

v.

SOCKEYE SOFTWARE, LLC, and
EMPIRE TECHNOLOGICAL GROUP, LTC.,

     Defendants.

---

## ORDER

---

     This matter comes before the Court on Defendant Empire Technological Group,

Ltd.'s Motion for Determination of Choice of Law [Docket No. 95], Defendant Empire

Technological Group, Ltd.'s Motion to Dismiss Plaintiff's Amended Complaint [Docket

No. 144], Defendant Empire Technological Group, Ltd.'s Rule 56 Motion for Summary

Judgment [Docket No. 161], and Modern's Motion to File Surreply to Empire's Motion

for Determination of Law [Docket No. 182]. Plaintiff Modern Gaming, Inc. ("Modern")

responded to the choice of law motion of Empire Technological Group, Ltd. ("Empire"),

Docket No. 131, and Empire filed a reply.[1] Docket No. 175. Regarding the motion to

dismiss, Modern filed a response, Docket No. 173, and Empire filed a reply. Docket No.

198. Regarding the motion for leave to file a surreply, Empire filed a response, Docket

---

[1] The certificate of conferral states that defendant Sockeye Software, LLC
("Sockeye") "does not oppose the relief requested." Docket No. 95 at 1 n.1. Sockeye
did not file briefs in response to any of the four motions presently before the Court.

No. 185, and Modern filed a reply.  Docket No. 188.  As to the motion for summary

judgment, Modern filed a response, Docket No. 204, and Empire filed a reply.  Docket

No. 236.  The Court has jurisdiction pursuant to 28 U.S.C. § 1332.

In the choice of law motion, Empire argues that Louisiana law governs Modern's

claims.  Docket No. 95 at 2.  Modern responds that Nevada law governs its claims.

Docket No. 131 at 2.  In the motion for summary judgment, Empire argues that it is

entitled to summary judgment on Modern's claims for tortious interference with contract,

intentional interference with prospective economic advantage[2], and civil conspiracy,

regardless of which state's law applies.  Docket No. 161 at 2 & n.2.

## I.  BACKGROUND

### A.  Undisputed Facts from Summary Judgment Briefing

Modern, Sockeye, and Empire do business in the computerized gaming industry,

both in Class II and Class III gaming.  Docket No. 161 at 3, ¶ 1.  Sockeye developed a

game known as "Big Bear Poker" which utilizes Sockeye's patented bingo math model.

*Id.* at 4, ¶ 7.[3]  Sockeye's Class II Big Bear Poker is different from any prior Class II

video poker and therefore filled a niche in the Class II market.  Docket No. 204 at 9,

---

[2] The complaint uses the phrase "tortious interference with economic advantage."
*See* Docket No. 118 at 20.  Nevada courts refer to this claim as one for "intentional
interference with prospective economic advantage," *see, e.g.*, *Wichinsky v. Mosa*, 847
P.2d 727, 729 (Nev. 1993), while Louisiana courts refer to it as "tortious interference
with business relations."  *JCD Mktg. Co. v. Bass Hotels & Resorts, Inc.*, 812 So. 2d 834,
841 (La. App. 2002).  For the sake of consistency, the Court will use the phrase
"intentional interference with prospective economic advantage" throughout the order.

[3] Modern denies this fact in part, arguing that Big Bear Poker is "gaming device
software," rather than, as asserted by Empire, a "gaming application."  Docket No. 204
at 3, ¶ 7.  For the purposes of this motion, the Court finds the distinction to be
immaterial and uses simply uses the word "game."

¶ 1.[4]  Modern and Sockeye entered into a License Agreement effective December 1, 2019 (the "Modern Agreement").  Docket No. 161 at 4, ¶ 8.  The Modern Agreement granted Modern an "exclusive license" to use Sockeye's platform development software ("PDS") in the territories of Florida, Alabama, New York, and Louisiana.  *Id.*, ¶ 9.  Sockeye and Modern amended the Modern Agreement on January 18, 2021 to add North Carolina and the Chickasaw Nation in Oklahoma as additional territories.  *Id.*, ¶ 11.  Modern could not place Big Bear Poker on its Apollo cabinet[5] until at least May 6, 2021, which is when Sockeye obtained approval from BMM Test Labs.  Docket No. 204 at 9-10, ¶ 3.

Modern entered into a sales agent agreement with Native Gaming Services ("Native Gaming") commencing February 1, 2021 and ending on January 31, 2024 ("Native Gaming Agreement").  Docket No. 161 at 5, ¶ 19.[6]  The Native Gaming Agreement gave Native Gaming and its representative, Delmar Weaver, the right to sell Big Bear Poker, on Modern's behalf, in Alabama, Florida, and North Carolina.  *Id.*, ¶ 20.

---

[4] Empire disputes this fact, stating that "the evidence cited does not support the facts stated."  Docket No. 236 at 4, ¶ 1.  The Court finds that the cited evidence supports Modern's asserted fact and will therefore deem this fact admitted.

[5] Although the undisputed facts do not make this clear, Modern's amended complaint explains that Modern's business involves manufacturing "the physical 'cabinets' on which gaming software is installed and then distributes those cabinets to casinos."  *See* Docket No. 118 at 5, ¶ 23.

[6] Modern disputes this fact in part, stating that "[t]he [Native Gaming] Agreement automatically renewed for one-year periods until either party terminated."  Docket No. 204 at 4, ¶ 19.  The Court finds, however, that Modern's argument is non-responsive to Empire's assertion.  According to the contract, which both parties cite, the agreement is subject to an initial term of three years, followed by automatic annual renewals for one-year periods.  *See* Docket No. 161-10 at 4.  The Court deems this fact admitted.  The Court also notes that, although the parties dispute the exact scope of the Native Gaming Agreement, the agreement appears to have been meant to help facilitate Modern's distribution of Big Bear Poker.  *See* Docket No. 161 at 5, ¶ 20.

The Poarch Creek Tribe is located in Alabama and subject to the Native Gaming Agreement.  *Id.*, ¶ 21.  In April 2021, Modern demonstrated Big Bear Poker for three casinos in Alabama owned by the Poarch Creek Tribe.  Docket No. 204 at 10, ¶ 8.  Following the demonstration, the Poarch Creek Tribe showed interest in Big Bear Poker.  *Id.*, ¶ 9.  However, as of January 2022 (more than 2 years into the Modern Agreement), the Poarch Creek Tribe had not placed a single order for Big Bear Poker.  Docket No. 161 at 5, ¶ 22.

Native Gaming did not provide Modern with any purchase orders for the purchase or lease of machines with Big Bear Poker in Alabama, Florida, or North Carolina.  *Id.* at 6, ¶ 27.[7]

In August 2021, Modern entered into a master operator agreement with another distributor, A&W Enterprises, LLC ("A&W").  *Id.*, ¶ 30.  Modern agreed to work exclusively with A&W for the placement of gaming devices with Big Bear Poker at the WinStar Casino and Resort ("WinStar") under the control of the Chickasaw Nation Gaming Commission.  *Id.*, ¶ 31.  A&W planned to place eight Big Bear Poker games in a high-traffic location of the WinStar.  Docket No. 204 at 10, ¶ 6.  If these games performed consistent with the average of A&W's other games, A&W intended to add more games.  *Id.*[8]  In January 2022, A&W submitted two Big Bear Poker games to the

---

[7] Modern states that this fact is "[a]dmitted only that casinos in Florida, Alabama, or North Carolina had not placed an order for Game Units when Defendants deprived Modern of its exclusive licensing rights."  Docket No. 204 at 5, ¶ 27.  The Court deems this fact admitted.

[8] Empire replies that this fact is "[u]ndisputed in part.  If [Big Bear Poker] did not perform consistent with A&W's average, it would not place more games or it would remove them, and there is no guarantee it would leave even eight games on the floor."  Docket No. 236 at 4, ¶ 6.  The Court finds this argument to be nonresponsive and deems this fact admitted.

testing laboratory for the WinStar's Tribe.  *Id.*, ¶ 7.  In A&W's experience, when a

gaming device is submitted to the WinStar's testing lab, it usually is approved.  *Id.*, ¶ 7.

Modern experienced problems implementing Big Bear Poker on its gaming devices and,

thus, claims it decided to hold off on pursuing placements with potential customers in

other jurisdictions until it could complete a test run at the WinStar.  Docket No. 161 at 6,

¶ 35.[9]  Modern did not instruct Native Gaming to pause on its marketing efforts in

Alabama, Florida, or North Carolina pending placement of Big Bear Poker units at the

WinStar.  *Id.* at 7, ¶ 36.

Sockeye and Empire initially explored a relationship in which Empire would

purchase Sockeye's Class III platform, purchase Sockeye's inventory pipeline, and

explore game development and distribution using Sockeye IP for both Class II and

Class III.  *Id.*, ¶ 40.  Empire informed Sockeye that, "to make this work, [Empire] would

need exclusivity for North America."  *Id.*, ¶ 42.  Sockeye repeatedly informed Empire

that its existing distributors were not performing and that it planned to terminate them.

*Id.*, ¶ 43.[10]  Empire's first draft of a license and distribution agreement proposed

---

[9] Modern denies this fact, stating that "Sockeye, not Modern, experienced delays
in obtaining BMM approval.  Modern did not 'hold off' on pursuing customers.  Modern
briefly focused on its placements at the WinStar before 'push[ing] hard to get [Big Bear
Poker] out in all the other jurisdictions.'"  Docket No. 204 at 6, ¶ 35.  The Court finds that
the first part of the denial is nonresponsive to Empire's assertion regarding problems
implementing Big Bear Poker, as neither the asserted fact nor the portion of the record
cited in support of the fact discusses BMM approval.  The Court finds that the second
part of the denial is nonresponsive as there does not appear to be a material distinction
between holding off on other placements until the WinStar trial run was complete and
focusing on the placements at the WinStar before pushing to place Big Bear Poker in
other locations.  To the extent that Modern is attempting to draw a greater distinction
than the, the exhibits it cites do not support any such distinction.  The Court deems this
fact admitted.

[10] Modern denies this fact, stating that "Sockeye informed Empire that its
distributor for the WinStar and Louisiana — i.e., Modern — was a 'reliable/successful

nationwide exclusivity for Empire, defining the territory covered by the agreement as

"North America" and "South America."  *Id.* at 8, ¶ 47.[11]  Empire's January 5 draft also

contained three separate and express representations and warranties by Sockeye

("Sockeye's Representations and Warranties"):

> Sockeye represents and warrants to ETG that as of the date hereof:
>
> a. the grant by Sockeye to ETG of the rights pursuant to this Agreement will not infringe the rights of any third party;
>
> b. Sockeye has all necessary rights and the corporate power and authority to enter into this Agreement and perform the obligations required herein.
>
> …
>
> d. to the best of Sockeye's knowledge, after due inquiry there are no agreements, arrangements or understandings which do or could interfere with, materially limit or materially impair Sockeye's performance of its obligations hereunder,"

*Id.*, ¶ 48.  Sockeye and Empire executed the Distributorship and License Agreement for

Gaming Software, Systems and Equipment (the "Empire/Sockeye Agreement") on

---

distributor.'  Sockeye also repeatedly instructed Empire to either buy out Modern's exclusive licensing rights or carve Modern's territories out of Empire's exclusivity because Sockeye planned to continue doing business with Modern.  Further, Sockeye's CEO does 'not recall stating that [he] could terminate [Modern] based on breach of contract.'"  Docket No. 204 at 6-7, ¶ 43 (internal citation omitted).  The Court finds that this argument is nonresponsive, as the fact that Sockeye at one point characterized Modern as a "reliable/successful distributor" does not create a genuine dispute of material fact as to whether Sockeye at another point informed Empire that Sockeye thought its distributors were not performing and that it planned to terminate them.  The Court deems this fact admitted.

[11] Modern disputes the phrase "more traditional" to describe the license and distribution agreement; *see* Docket No. 161 at 8, ¶ 47; Docket No. 204 at 7, ¶ 47, stating that "Empire fails to show that its agreement is 'more traditional.'"  Docket No. 204 at 7, ¶ 47.  The Court agrees that Empire fails to cite evidence regarding the "more traditional" nature of the proposed agreement.

February 9, 2022. *Id.* at 9, ¶ 53.[12]  At no point during the negotiations leading up to the

Empire/Sockeye Agreement did Sockeye advise Empire that Sockeye could not

terminate its existing distributor agreements or that such termination could effectuate a

breach of any of those agreements. *Id.*, ¶ 54.[13]  The Empire/Sockeye Agreement

contained the same Representations and Warranties that were in the first draft of the

agreement and every draft thereafter. *Id.*, ¶ 55.  As of February 16, 2022, Empire

believed that the Sockeye had terminated the Modern Agreement. *Id.* at 9-10, ¶ 57.

### B. <u>Procedural History</u>

Modern originally filed the claims in this case against Sockeye and Empire in the

Middle District of Louisiana in 2022. *See Modern Gaming, Inc. v. Sockeye Software,*

*LLC*, 3:22-cv-00357-BAJ-SDJ, Docket No. 1 (M.D. La. June 1, 2022).  Empire filed a

motion to dismiss for failure to state a claim. *Id.*, Docket No. 11 (M.D. La. July 11,

---

[12] The asserted fact states that "Sockeye and Modern" executed this agreement. Docket No. 161 at 9, ¶ 53.  The Court understands this to be a typographical error; the sentence should instead state that Sockeye and Empire executed the agreement. Empire states that the agreement was executed on February 8, 2022. *See id.*  Modern admits that "Sockeye executed the Empire Agreement on February 8, 2022, and Empire executed the Empire Agreement on February 9, 2022."  Docket No. 204 at 8, ¶ 53. Modern correctly characterizes the dates. *See* Docket No. 161-24 at 21.  For the sake of accuracy, and because the distinction between the two dates is immaterial, the Court uses February 9, 2022 – the date by which both Sockeye and Empire executed the agreement – as the relevant date.

[13] Modern disputes this fact, stating that "Sockeye told Empire that Modern is a 'reliable/successful distributor.'  Sockeye also instructed Empire to either buy out Modern's licensing rights or carve out Modern's territories.  Sockeye's repeated attempts to have Empire buy out or carve out Sockeye's 'reliable/successful distributor' made Empire well aware that Sockeye could not permissibly terminate the License Agreement."  Docket No. 204 at 8, ¶ 54 (internal citations omitted).  Modern's response does not cite any evidence contradicting the assertion that Sockeye did not advise Empire that Sockeye was unable to terminate its existing agreements or that doing so would constitute a breach of contract.  Instead, Modern's response offers reasons why Empire could have inferred that Sockeye was unable to terminate its agreement with Modern.  The Court deems this fact admitted.

2022).  Sockeye filed a motion to dismiss for lack of personal jurisdiction.  *Id.*, Docket

No. 24 (M.D. La. Sept. 13, 2022).  The court granted both motions, although it gave

Modern the opportunity to conduct jurisdictional discovery and to file an amended

complaint.  *Id.*, Docket No. 31 at 6-8 (M.D. La. Jan. 11, 2023).  On March 14, 2023,

Modern filed an unopposed motion to dismiss its claims without prejudice.  *Id.*, Docket

No. 32 at 1 (M.D. La. Mar. 14, 2023).  On March 21, 2023, the court granted the motion.

*Id.*, Docket No. 33 (M.D. La. Mar. 21, 2023).

On June 21, 2023, Modern filed a complaint against Sockeye and Empire in the

District of Colorado.  Docket No. 1.  The complaint asserted the breach of contract and

promissory estoppel claims against Sockeye, tortious interference with contract and

intentional interference with prospective economic advantage claims against Empire,

and a civil conspiracy claim against both defendants.  Docket No. 1 at 11-15.

On August 24, 2023, Empire filed an answer as well as a crossclaim against

Sockeye for breach of contract, fraudulent or negligence inducement, and

indemnification.  Docket No. 19.  On October 11, 2023, Sockeye filed an answer as well

as counterclaims against Modern for breach of contract, promissory estoppel, and fraud

in the inducement.  Docket No. 35.  On October 20, 2023, Sockeye filed an amended

answer and counterclaims.  Docket No. 46.  On October 27, 2023, Modern filed an

answer to Sockeye's counterclaims.  Docket No. 47.  On December 12, 2023, before

Sockeye responded to the crossclaims, Empire voluntarily dismissed its crossclaims

without prejudice.  Docket No. 51 at 1.

On October 18, 2023, Magistrate Judge Scott T. Varholak entered a scheduling order setting the discovery cut-off for July 19, 2024.  Docket No. 44 at 18.  After extensions, Judge Varholak set discovery to end on March 14, 2025.  Docket No. 85.

On February 14, 2025, Modern filed a motion seeking to amend its complaint to add a claim for exemplary damages.  Docket No. 86.  On March 18, 2025, Judge Varholak held a hearing and granted Modern's motion to amend the complaint.  Docket No. 119 at 1.  The same day, Modern filed its amended complaint.  Docket No. 118.  The amended complaint contains the same claims as the original complaint.  *Compare* Docket No. 1 *with* Docket No. 118.

## II.  LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A disputed fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."  *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quotations

omitted).  "Once the moving party meets this burden, the burden shifts to the nonmoving

party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works of

Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994).  The

nonmoving party may not rest solely on the allegations in the pleadings, but instead

must designate "specific facts showing that there is a genuine issue for trial."  *Celotex

Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quotations omitted).  "To avoid summary

judgment, the nonmovant must establish, at a minimum, an inference of the presence of

each element essential to the case."  *Bausman*, 252 F.3d at 1115.  When reviewing a

motion for summary judgment, a court must view the evidence in the light most

favorable to the non-moving party.  *Id.*

### III.  ANALYSIS

#### A.  <u>Choice of Law</u>

A court conducts a choice of law analysis "whenever the selection could create

even the possibility of a different outcome."  *See N8 Med., Inc. v. Colgate-Palmolive

Co.*, 727 F. App'x 482, 485 (10th Cir. 2018) (unpublished).  "If the laws of both states

relevant to the set of facts are the same, or would produce the same decision in the

lawsuit, there is no real conflict between them."  *Phillips Petroleum Co. v. Shutts*, 472

U.S. 797, 838 n.20 (1985); *see also Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455,

462 (3d Cir. 2006) ("According to conflicts of laws principles, where the laws of the two

jurisdictions would produce the same result on the particular issue presented, there is a

'false conflict,' and the Court should avoid the choice-of-law question.").  As explained

below, the Court finds that the application of either Louisiana or Nevada law would lead

to the same result in this case: the dismissal of Modern's claims against Empire.

Therefore, the Court will not conduct a choice of law analysis and will deny as moot

Empire's motion seeking a determination of the application law.  The Court will also

deny as moot Modern's motion to file a surreply on this issue.

### B.  Application of Louisiana Law

Empire moves for summary judgment under Louisiana law on each of Modern's

three claims against Empire: interference with contract intentional interference with

prospective economic advantage and civil conspiracy.  Docket No. 161 at 2.


### 1.  Tortious Interference with Contract

Louisiana law does not recognize the tort of intentional interference with contract

except for when the claim is brought against a corporate officer for interfering in the

contractual relationship between the officer's employer and a third party.  *See 9 to 5*

*Fashions, Inc. v. Spurney*, 538 So. 2d 228, 233-34 (La. 1989).  The facts of this case do

not involve a claim that a corporate officer interfered with a contract held by the officer's

employer.[14]  The Court finds that, under Louisiana law, Modern's claim for tortious

interference with contract fails.

### 2.  Intentional interference with Prospective Economic Advantage

Empire argues that there is no evidence supporting a required element of

Modern's claim for intentional interference with prospective economic advantage.

Docket No. 161 at 15-16.  Under Louisiana law, Modern must show that Empire

"improperly influenced others not to deal with the plaintiff."  *McCoin v. McGehee*, 498

So. 2d 272, 274 (La. Ct. App. 1986).  Implicit in this "improper influence" requirement is

that the defendant has acted with actual malice.  *JCD Mktg. Co. v. Bass Hotels &*

---

[14] Modern's response to the motion for summary judgment does not seek to defend this claim under Louisiana law.

*Resorts, Inc.*, 812 So. 2d 834, 841 (La. App. 2002).  "Although its meaning is not perfectly clear, the malice element seems to require a showing of spite or ill will, which is difficult (if not impossible) to prove in most commercial cases in which conduct is driven by the profit motive, not by bad feelings."  *Id.* (citation omitted).  Empire argues that there is no evidence that it acted with actual malice.  Docket No. 161 at 15.  The Court agrees that Modern has not identified any evidence that Empire acted with actual malice.  The Court finds that, under Louisiana law, Modern's claim for intentional interference with prospective economic advantage fails.

### 3.  Civil Conspiracy

Empire moves for summary judgment on Modern's claim for civil conspiracy. Docket No. 161 at 20.[15]  Under Louisiana law, civil conspiracy is not actionable as an independent claim.  *Markiewicz v. Sun Constr., L.L.C.*, 343 So. 3d 758, 766 (La. Ct. App. 2022).  "The actionable element of a conspiracy claim is not the conspiracy itself, but rather the underlying tort the conspirators agree to perpetrate and actually commit in whole or in part."  *Id.*  Modern's theory of the conspiracy, as alleged in the amended complaint, is that the underlying tort involved in the conspiracy was tortious interference with Modern's existing and prospective business relationships.  Docket No. 118 at 18-19, ¶¶ 90-91.  As explained above, the Court finds that Modern's two tortious interference claims against Empire fail under Louisiana law.  Without the existence of an

---

[15] Modern's response to the motion for summary judgment does not seek to defend this claim other than to say "Empire's only argument as to 'Modern's civil conspiracy claim is that 'Modern's tortious interference claims fail.'  Because summary judgment on the tortious interference claims is improper, it should also be denied as to Modern's civil conspiracy claim."  Docket No. 204 at 14 n.2 (internal citation omitted).

underlying tort, Modern's claim for civil conspiracy also fails under Louisiana law. *See Markiewicz*, 343 So. 3d at 766.

The Court therefore finds that, if Louisiana law applies to Modern's claims against Empire, Empire is entitled to summary judgment on each of the three claims against it.

### C. Application of Nevada Law

Empire also claims that it is entitled to summary judgment under Nevada law on each of Modern's three claims against Empire: tortious interference with contract, intentional interference with prospective economic advantage, and civil conspiracy. Docket No. 161 at 2.

Under Nevada law, the elements of a claim for tortious interference with a contract are: 1) a valid and existing contract, 2) the defendant's knowledge of that contract, 3) intentional acts by the defendant intended to or designed to disrupt the contractual relationship, 4) actual disruption of the contract, and 5) resulting damages. *J.J. Indus., LLC v. Bennett*, 71 P.3d 1264, 1267 (Nev. 2003). The elements of a claim for intentional interference with prospective economic advantage under Nevada law are: 1) a prospective contractual relationship between the plaintiff and a third party, 2) knowledge by the defendant of the prospective relationship, 3) intent to harm the plaintiff by preventing the relationship, 4) the absence of privilege or justification by the defendant, and 5) actual harm to the plaintiff as a result of the defendant's conduct. *Leavitt v. Leisure Sports Incorporation*, 734 P.2d 1221, 1225 (Nev. 1987). Under Nevada law, a civil conspiracy claim requires "a combination of two or more persons

who, by some concerted action, intend to accomplish an unlawful objective for the
purpose of harming another, and damage results from the act or acts." *Sutherland v.
Gross*, 772 P.2d 1287, 1290 (Nev. 1989).

In addition to other arguments, Empire argues that Modern's claims, under
Louisiana or Nevada law, fail for lack of proof of damages. Docket No. 161 at 19-20.
Empire asserts that Modern's damages are solely based on lost profits as a result of
Modern's inability to distribute Big Bear Poker. *Id.* at 19. Empire states that "the
undisputed evidence shows that Modern had no present contracts for the placement of
[Big Bear Poker] nor any reasonably certain future contracts for the placement of [Big
Bear Poker]." *Id.* Thus, Empire argues, Modern's damages are too speculative to
support its claims. *Id.* at 19-20. Modern responds by pointing to two reports by its
damages experts. Docket No. 204 at 19-20. Modern asserts that these reports provide
a "detailed assessment of Modern's damages." *Id.* at 19.

Under Nevada law, lost profits are "generally an appropriate measure of
damages so long as the evidence provides a basis for determining, with reasonable
certainty, what the profits would have been." *Eaton v. J. H., Inc.*, 581 P.2d 14, 17 (Nev.
1978); *see also Georges Tannoury, MD, PC v. Stacey Kokopelli Med., P.C.*, 130 Nev.
1181, 2014 WL 1270582, at *1 (Nev. 2014) (unpublished table decision). "The rule
barring recovery of uncertain lost profits is directed against 'uncertainty as to the
existence of (profits) rather than as to measure or extent.'" *Hall v. Liberty Mut. Gen. Ins.
Co.*, 2017 WL 4349225, at *5 (D. Nev. Sept. 29, 2017) (quoting *Gen. Elec. Supply Co.
v. Mt. Wheeler Power, Inc.*, 587 P.2d 1312, 1313 (Nev. 1978)). For a new business
venture where there is no history of profits, such as Modern and its efforts to place Big

Bear Poker, courts ask whether there is evidence "from which a jury reasonably could ascertain lost profits." *Houston Expl. Inc. v. Meredith*, 728 P.2d 437, 439 (1986) (quoting *Bader v. Cerri*, 609 P.2d 314, 318 (1980)).  Once "the trier of fact is presented with lost profits to a reasonable certainty, 'the existence and extent of lost profits . . . become issues of evidentiary weight instead of admissibility.'" *Wills v. Collins Cap. LLC*, 571 P.3d 93, 2025 WL 1711615, at *3 (Nev. 2025) (unpublished table decision) (quoting *Houston Expl.*, 728 P.2d at 439) (alternation omitted); *see also Hall*, 2017 WL 4349225, at *5 (applying Nevada law).  In *Hall*, the court found that lost profits were too speculative in a case where the undisputed facts showed that the plaintiff had not yet arranged any transactions from which he would make the allegedly lost profits. *See Hall*, 2017 WL 4349225, at *5.

The Court finds that the undisputed facts show that Modern has failed to satisfy the "reasonable certainty" standard for lost profit damages.  Modern's agreement with Sockeye provided Modern with distribution rights in Oklahoma, New York, Florida, Alabama, North Carolina, and Louisiana.  Docket No. 161 at 4, ¶¶ 9, 11.  Modern's expert reports, Docket Nos. 204-1, 204-2, which Modern identifies in the response to Empire's motion as the evidence of damages, address purported losses in Oklahoma, New York, Florida, Alabama, and Louisiana.  *See generally* Docket Nos. 204-1, 204-2. The Court will discuss Oklahoma, Louisiana, and New York individually and will discuss Florida and Alabama together.

### 1. Oklahoma

Modern had placed two Big Bear Poker games in the testing laboratory at the WinStar Casino in Oklahoma.  Docket No. 204 at 10, ¶ 7.  The question is whether the

placement of the games in the Winstar laboratory creates the requisite "reasonable certainty" that Modern experienced lost profits in Oklahoma.

Melvin D. Adair, an employee of A&W, the distributor with whom Modern was working to place games at the WinStar Casino, testified at his deposition that, once a game has been submitted to the WinStar testing lab, it is usually approved.  *See id.*; *see also* Docket No. 204-18 at 9-10, 37:25-38:4.  However, neither the portion of Mr. Adair's testimony identified by Modern, nor other parts of the deposition transcript submitted in the briefing explains the basis for Mr. Adair's opinion.  Modern offers no evidence of what experience Mr. Adair bases his opinion on,[16] the type of games he bases his opinion on, or the time period and number of games involved.  Such information is relevant to the "reasonable certainty" inquiry since, whatever the "usual" rate of game approvals may have been, Big Bear Poker is not, according to Modern, a typical game.  *See* Docket No. 204 at 9, ¶ 1 ("Class II Big Bear Poker is different from any prior Class II video poker [game].").  Thus, without knowing what type of games Mr. Adair's experience was based on, it is speculative to assume that such experience would enable Mr. Adair to predict the likelihood of approval of a novel game such as Big Bear Poker.  The testimony of Mr. Adair about the likelihood of approval therefore does not establish whether Modern had a "reasonable certainty" of having the WinStar laboratory approve Big Bear Poker.

Modern's response to Empire's motion asserts that the reports of Modern's damages experts, Scott Molina and Jon Ahern, substantiate Modern's lost profits.

---

[16] Empire does not challenge the opinion pursuant to Federal Rules of Evidence 701 or 702.

Docket No. 204 at 19-20.  Empire and Sockeye have filed motions to exclude the
testimony of these experts pursuant to Federal Rule of Evidence 702.  *See* Docket No.
154 (Empire's motion to exclude Mr. Ahern); Docket No. 159 (Sockeye's motion to
exclude Mr. Molina); Docket No. 160 (Empire's motion to exclude Mr. Molina).  Without
reaching the merits of the Rule 702 motions, the Court considers the contents of Mr.
Molina's report based on Rule 702 as to the "reasonable certainty" analysis.[17]  *See*
Docket No. 204-1.  Mr. Molina's basis for concluding that Modern was going to place
games at WinStar Casino is as follows:

> I understand that Modern had an oral agreement with A&W for A&W to place 8-
> 10 gaming devices with Big Bear Poker at the WinStar World Casino & Resort.
> Two of these gaming devices were being tested at the Chickasaw Nation's
> testing lab at the time Sockeye terminated the License Agreement.
> (A&W_0095).  It appears based on photographs presented to me that Modern
> had already purchased at least six additional Apollo cabinets for placement at the
> WinStar upon completion of testing at the Chickasaw Nation's testing lab.
> (MG_009925-28).  It therefore appears highly likely that Modern would have
> placed at least an initial eight Big Bear Poker cabinets at the WinStar near the
> end of the first quarter of 2022.

Docket No. 204-1 at 27.  This opinion, however, does not explain Mr. Molina's
assumptions about the likelihood of the WinStar testing laboratory approving Big Bear
Poker for placement in its casino.  And it does not explain the likelihood, assuming such
approval, of WinStar and Modern signing a formal agreement to place 8-10 games with
Big Bear Poker at the WinStar casino.  If the WinStar testing laboratory did not approve
Big Bear Poker, then Mr. Molina's analysis would fail because there would be no

---

[17] Modern offers Mr. Molina as an expert on the gaming industry.  *See* Docket
No. 197 at 35; *see also* Docket No. 204-1.  Modern offers Mr. Ahern as an expert on
financial analysis.  *See* Docket No. 197 at 35; *see also* Docket No. 204-2.  Mr. Ahern's
report incorporates Mr. Molina's opinions on Modern's projected placement efforts in the
relevant territories.  *See* Docket No. 204-2 at 7, ¶ 22.  Given that, the Court needs only
to review Mr. Molina's opinions for the purposes of this order.

placements in the casino leading to the profits that he estimated.  *See Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1080 n.4 (10th Cir. 2006) ("Expert testimony that fails to make clear that certain facts the expert describes as true are merely assumed for the purpose of an economic analysis may not assist the trier of fact at all and, instead, may simply result in confusion."); *Cap. Sols., LLC v. Konica Minolta Bus. Sols. U.S.A., Inc.*, 2010 WL 561721, at *5 (D. Kan. Feb. 12, 2010) (excluding expert testimony pursuant to Rule 702 when the expert did not explain how he arrived at key assumptions); *Direct Mortg. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 2011 WL 1225977, at *3 (D. Utah Mar. 29, 2011) (excluding expert testimony pursuant to Rule 702 when the damages expert merely accepted a sales projection number from the plaintiff without any attempt to identify support for the information); *SouthStar Expl., LLC v. 7C Land & Mins., Co.*, 2021 WL 4483796, at *3 (W.D. Okla. Feb. 18, 2021) ("because [the expert witness] has not identified how he calculated the drainage damages and has failed to provide any supporting documentation, he should not be allowed to testify regarding any alleged drainage damages.").  The Court finds that neither Mr. Adair's testimony about the likelihood of approval of the two Big Bear Poker games being tested nor the opinions of Mr. Molina about the "high" likelihood of Modern placing an initial eight Big Bear Poker cabinets at the WinStar Casino constitute sufficient evidence that Modern suffered damages to a "reasonable certainty" due to Sockeye's cancellation of the Modern Agreement.  As a result, Modern fails to create a genuine issue of material fact to defeat summary judgment for Empire as to Modern's claims for tortious interference with a contract, intentional interference with prospective

economic advantage, and civil conspiracy based on damages in Oklahoma.  *See Hall*,
2017 WL 4349225, at *5.

### 2. Louisiana

Modern asserts that it had an agreement to place games at the Paragon Casino
in Louisiana.  Docket No. 204 at 17.  Modern, however, has only produced an unsigned
contract as evidence of such agreement.  *See* Docket No. 161 at 5, ¶¶ 16-17; Docket
No. 204 at 4, ¶¶ 16-17.  Nevertheless, Modern points to Mr. Molina's report as proof that
Modern incurred damages in Louisiana.  Docket No. 204 at 19-20; Docket No. 204-1 at
29-31.  However, Mr. Molina acknowledges that Paragon had not yet signed "Modern's
draft contract and contracts from two other Class II manufacturers because the casino
was waiting on the [Tunica-Biloxi Tribe, which operates Paragon,] to approve the Class
II initiative."  Docket No. 204-1 at 29-30.  The Court finds that no reasonable juror could
conclude from either the unsigned contract or Mr. Molina's report that lost profits in
Louisiana were reasonably certain.

### 3. New York

The Court finds that Modern has also failed to adduce sufficient evidence of lost
profits in New York.  Modern has not identified any evidence that it was in discussions
with casinos in New York to place Big Bear Poker at the time of the alleged interference.
For this reason alone, there is no reasonable certainty of lost profit damages.
Moreover, Mr. Molina's analysis about the New York gaming market, and the reasons
he believes Modern would have been successful in that market, hinge on several
contingencies.  According to Mr. Molina, four companies hold either "Lot 1" or "Lot 3"
contracts with the New York State Gaming Commission to provide video poker
machines to New York casinos from July 1, 2021 through December 31, 2029.  *See id.*

19

at 12-13.  These four companies apparently have the ability to subcontract with other
companies, such as Modern, to place games in New York casinos.  *Id.* at 13.  Mr.
Molina's damages opinion relies on his belief that Big Bear Poker could have been
modified to meet New York regulatory requirements, that regulatory authorities would
have approved the game, and that one of the four companies with state contracts would
have then agreed to subcontract with Modern.  *See id.* at 13-17.  An expert whose
damages opinion relies upon contingencies predicated on contingencies does not
provide reasonable certainty for his or her opinions.  *See Fantasia Distribution, Inc. v.
Cool Clouds Distribution, Inc.*, 693 F. Supp. 3d 335, 345 (E.D.N.Y. 2023) ("Expert
testimony should be excluded if it is 'speculative or conjectural.'") (citations omitted);
*Cardenas v. W. Express*, 2021 WL 6751137, at *2 (W.D. Okla. Feb. 12, 2021)
(excluding an expert opinion pursuant to Rule 702 when the expert's opinion was
"premised on layers of speculation."); *cf. EcoFactor, Inc. v. Google LLC*, 137 F.4th
1333, 1343 (Fed. Cir. 2025) (excluding expert testimony when it was based on an
erroneous premise).  The Court finds that Mr. Molina's opinion fails to provide any
reasonable certainty of lost profits in New York.

### 4.  Florida and Alabama

The undisputed facts show that Modern was unable to generate any sales orders
for Big Bear Poker in Florida or Alabama.  *See* Docket No. 161 at 5-6, ¶¶ 22, 25-27.
The Court finds that, given this failure to generate sales orders, there is no reasonable
certainty of lost profits for Modern in these markets.  Mr. Molina's opinion does not
provide any information that cures these deficiencies.  Mr. Molina explains Modern's
inability to secure a contract with the Poarch Creek Tribe in Alabama as being due to
regulatory approval issues.  *See* Docket No. 204-1 at 31.  However, Mr. Molina's report

indicates that the regulatory issue had been resolved by November 2021. *Id.* Despite

such resolution, Modern had not secured any contract in Alabama by January 2022.

*See* Docket No. 161 at 5, ¶ 22. Regarding Florida, Mr. Molina's report states that he

understood Modern to be "waiting" to pursue an opportunity with the Miccosukee Tribe

in Florida. Docket No. 204-1 at 32. However, Modern offers no evidence that its

placement efforts in Florida and Alabama created a reasonable certainty of lost profits in

either state.

As the Court finds that Modern has failed to create a genuine dispute of material

fact that there is a "reasonable certainty" it suffered lost profit damages under Nevada

law, the Court finds that, if Nevada law applies to Modern's claims against Empire,

Empire is entitled to summary judgment on each of the three claims against it.[18]

Because Modern's claims against Empire for tortious interference with a contract,

intentional interference with prospective economic advantage, and civil conspiracy fail

under either Louisiana or Nevada law, the Court will grant Empire's motion for summary

judgment and dismiss with prejudice each of the three claims that Modern alleges

against Empire.

### D. <u>Disposition of Other Motions</u>

Because Modern's claims against Empire will be dismissed, the Court will also

deny as moot four Rule 702 motions directed at Empire's and Modern's expert

witnesses: Plaintiff's Motion to Partially Exclude Buddy Frank, Docket No. 151; Plaintiff's

---

[18] The Court notes that Colorado law, which governs the claims between Modern and Sockeye, uses the same "reasonable certainty" standard as Nevada in evaluating lost profit damages. *See Denny Const., Inc. v. City & Cnty. of Denver ex rel. Bd. of Water Comm'rs*, 199 P.3d 742, 746 (Colo. 2009). Sockeye did not, however, argue in its motion for summary judgment that Modern's claims fail for lack of certainty regarding damages.

Motion to Partially Exclude Jeff George, Docket No. 152; Defendant Empire

Technological Group, Ltd.'s Motion to Exclude Expert Testimony of Jon Ahern under

Rule 702, Docket No. 154; and Defendant Empire Technological Group, Ltd.'s Motion to

Exclude Expert Testimony of Scott Molina under Rule 702.  Docket No. 160.  The Court

also denies as moot Defendant Empire Technological Group, Ltd.'s Motion to Dismiss

Plaintiff's Amended Complaint.  Docket No. 144.

## IV.  CONCLUSION

It is therefore

**ORDERED** that Defendant Empire Technological Group, Ltd.'s Motion for

Determination of Choice of Law [Docket No. 95] is **DENIED as moot**.  It is further

**ORDERED** that Modern's Motion to File Surreply to Empire's Motion for

Determination of Law [Docket No. 182] is **DENIED as moot**.

**ORDERED** that Defendant Empire Technological Group, Ltd.'s Rule 56 Motion

for Summary Judgment [Docket No. 161] is **GRANTED**.  It is further

**ORDERED** that the third claim of Modern's amended complaint, as alleged

against Empire, and the fourth and fifth claims of Modern's amended complaint are

**DISMISSED with prejudice**.  It is further

**ORDERED** that Empire Technological Group, Ltd. is **DISMISSED** as a defendant

in this case.  It is further

**ORDERED** that Defendant Empire Technological Group, Ltd.'s Motion to Dismiss

Plaintiff's Amended Complaint [Docket No. 144] is **DENIED as moot**.  It is further

**ORDERED** that Docket Nos. 151, 152, 154, and 160 are **DENIED as moot**.  It is

further

**ORDERED** that Plaintiff's Unopposed Motion for Leave to File Combined 30-

Page Response to Defendants' Motions to Exclude Scott Molina [Docket No. 202] is

**GRANTED**.[19]

DATED January 13, 2026.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge

---

[19] Modern filed this motion on May 27, 2025 seeking leave of the Court to file a
30-page combined response to Sockeye and Empire's motions to exclude one of
Modern's experts.  *See* Docket No. 202.  On May 28, 2025, Modern filed the 30-page
combined response.  *See* Docket No. 207.