IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 23-cv-01583-PAB-STV

MODERN GAMING, INC.,

     Plaintiff,

v.

SOCKEYE SOFTWARE, LLC, and
EMPIRE TECHNOLOGICAL GROUP, LTC.,

     Defendants.

---

## ORDER

---

This matter comes before the Court on Sockeye Software's Motion to Dismiss Modern's Conspiracy Claim [Docket No. 143] and Sockeye Software Inc.'s Amended Motion for Summary Judgment on Modern Gaming Inc.'s Breach of Contract and Conspiracy Claims [Docket No. 180].[1]  Plaintiff Modern Gaming, Inc. ("Modern") filed responses to the motion to dismiss, Docket No. 174, and to the motion for summary judgment.  Docket No. 210.  Sockeye filed a reply on the motion for summary judgment.  Docket No. 233.[2]  The Court has jurisdiction pursuant to 28 U.S.C. § 1332.

---

[1] On May 1, 2025, Sockeye filed a notice stating that it was filing an amended motion for summary judgment "with the consent of the opposing parties" because Sockeye had "inadvertently filed a prior version of the motion and apologizes for the error."  Docket No. 181 at 1.  Modern's response appears to treat Docket No. 180 as the operative motion for summary judgment.  The Court will therefore deny as moot Sockeye's initial motion for summary judgment at Docket No. 157.

[2] The certificate of conferral for the motion to dismiss states that "Empire takes does not oppose this motion."  Docket No. 143 at 1.  It is not clear to the Court whether Sockeye meant to say that defendant Empire Technological Group Ltd. ("Empire")

## I. UNDISPUTED FACTS

### A. <u>The Parties and the Relevant Agreements</u>

Modern is a Louisiana corporation that manufactures and distributes electronic gaming hardware and devices.  Docket No. 180 at 2, ¶ 1.  Sockeye is a Colorado limited liability company that develops and licenses software in the field of electronic gaming. *Id.*, ¶ 2.  Sockeye owns 16 bingo-mathematical patents (the "patents") and uses the patents to create video casino games that meet Class II regulatory requirements, but with outcome probabilities similar to a Class III game; this creates a tax advantage for some casinos.  *Id.*  On June 13, 2019, Sockeye suggested that the parties enter into a distribution agreement which would have granted Modern a license to use Sockeye's games.  *Id.* at 3, ¶ 4.  Jason deGrandmaison, Modern's representative, rejected Sockeye's proposed distribution agreement and instead indicated that Modern wanted to enter into "a platform license agreement." *Id.*[3]  On December 1, 2019, Sockeye and Modern executed a License Agreement.  *Id.*, ¶ 5.[4]  The License Agreement granted

---

"takes no position" on the motion or that Empire "does not oppose this motion."  In any event, the Court notes that Empire did not file any briefing regarding this motion.  The certificate of conferral for the motion for summary judgment states that "counsel for Sockeye conferred with counsels [sic] for the other parties.  Modern opposes this motion."  Docket No. 180 at 1.  Although this certificate does not actually state Empire's position on the motion, the Court notes that Empire did not file any briefing regarding this motion.

[3] Modern disputes this fact, stating that "Modern did not 'insist' on a 'platform license agreement.'  Modern did not use the version of the License Agreement Sockeye proposed because it required Sockeye to be licensed, and the parties were concerned Sockeye would be unable to obtain licensure."  Docket No. 210 at 3, ¶ 4.  The Court finds the question of whether Modern "insisted" on another agreement or just asked for one to be a matter of semantics that is not material.

[4] Modern denies this fact in part, stating that "Sockeye and Modern executed the License Agreement on December 3, 2019."  Docket No. 210 at 3, ¶ 5.  While it is difficult to read the handwritten dates on the agreement, the distinction between December 1 and December 3 is immaterial for purposes of this order.  The Court deems this fact to be admitted.

Modern a "nontransferable, exclusive copyright license to install GDS onto Gaming

Units utilizing the PDS" as well as "a nontransferable, exclusive copyright license to

copy GDS for inclusion in [Modern's] Gaming Applications."  *Id.*

Under the License Agreement, the acronym "PDS" is defined as "the software

developed by [Sockeye] that is utilized in developing Gaming Device Software.  This

includes features and functionality described in the attached Addendum A, but does not

include the game specific features and functionality that may change from Gaming

Application to Gaming Application."  *Id.*, ¶ 6 (emphasis omitted).[5]  "Gaming Device

Software" or "GDS" means the "software program that is developed using the [PDS] and

is compatible with and interoperates with the PDS and that is approved for commercial

release by a gaming laboratory and is required for proper operation of a Gaming

Application."  *Id.*, ¶ 7.[6]  "Gaming Application" means "any application that can be used in

the commercial or charitable Gaming Industry . . . includ[ing] but not limited to . . . Video

Poker Machine."  *Id.* at 4, ¶ 8.[7]  "Game Software" or "GS" refers to the math, graphics,

---

[5] Modern denies this fact in part, stating that "[o]ther provisions inform the meaning of PDS.  (*See id.* §§ 1.5, 1.6, 1.18, 2.3, 6.2, 8.2, 10.1, 12.1, 13.2.)."  Docket No. 210 at 3, ¶ 6.  The Court's practice standards require that "[a]ny denial shall be accompanied by a brief factual explanation of the reason(s) for the denial and a specific reference to material in the record supporting the denial."  *See* Practice Standards (Civil cases), Chief Judge Philip A. Brimmer, § III.F.3.b.iv.  The Court finds that Modern has failed to provide sufficient factual explanation of how other provisions of the contract inform the meaning of PDS.  Moreover, from a review of the contract provisions that Modern cites, the Court is unable to discern how they inform the definition of PDS provided by the contract.  The Court deems this fact to be admitted.

[6] Modern denies this fact in part, stating that "[o]ther provisions inform the meaning of Gaming Device Software ("GDS").  (*See id.* §§ 1.4, 1.7, 1.12, 1.18, 2.3, 2.4, 2.5, 2.6, 6.2, 12.1, 13.2.)."  Docket No. 210 at 3, ¶ 7.  For the same reasons discussed in footnote 5, the Court deems this fact to be admitted.

[7] Modern denies this fact in part, stating that "[o]ther provisions inform the meaning of Gaming Application.  (*See id.* §§ 1.4, 1.5, 1.7, 1.11, 1.13, 1.15, 6.2.)."

sound and game rules incorporated in a Gaming Application.  *Id.*, ¶ 9.[8]  "Game Unit"

means "any electronic or mechanical Gaming Application that utilizes the GDS and is

sold or distributed by the Licensee." Game Units may be either Leased or Sold.  *Id.*,

¶ 10.[9]

 Once Modern installed the GDS into a game unit, and either leased or sold it, the

License Agreement required Modern to pay Sockeye an IP license fee of $9.00 per day

per game unit per location.  *Id.*, ¶ 12.  The License Agreement does not reference Big

Bear Poker.  *Id.*, ¶ 13.

 In December 2, 2021, Sockeye began negotiations with defendant Empire.  *Id.* at

5, ¶ 17.[10]  On February 8, 2022, Sockeye and Empire executed a distributorship and

licensing agreement (the "Empire agreement").  *Id.*, ¶ 18.[11]

---

Docket No. 210 at 3, ¶ 8.  For the same reasons discussed in footnote 5, the Court
deems this fact to be admitted.

 [8] Modern denies this fact in part, stating that "[o]ther provisions inform the
meaning of Game Software ("GS").  (*See id.* §§ 1.18, 1.28, 7.5, 10.1, 12.1, 12.5, 13.2)."
Docket No. 210 at 3, ¶ 9.  For the same reasons discussed in footnote 5, the Court
deems this fact to be admitted.

 [9] Modern denies this fact in part, stating that "[o]ther provisions inform the
meaning of Game Unit.  *See* License Agreement §§ 1.8, 1.9, 1.12, 1.16, 1.18, 1.28, 2.5,
2.8, 2.9, 3, 5.3(c), 6.2, 8.2, 10.1, 13.2, Ex. 4)."  Docket No. 210 at 3, ¶ 10.  For the same
reasons discussed in footnote 5, the Court deems this fact to be admitted

 [10] Modern denies this fact, stating that "Sockeye and [Empire] began negotiations
before December 2, 2021."  Docket No. 210 at 4, ¶ 19.  Modern cites evidence that
Sockeye and Empire had discussions about a potential business relationship earlier.
*Id.*; *see also* Docket Nos. 210-7, 210-8.  The Court finds that whether those earlier
discussions also constituted "negotiations" to be a matter of semantics and that, in any
event, exactly when the Sockeye-Empire discussions began is immaterial for the
purposes of this order.  The Court deems this fact to be admitted.

 [11] Modern denies this fact in part, stating that "Empire executed the Empire
Agreement on February 9, 2022."  Docket No. 210 at 4, ¶ 18.  According to the
agreement, a Sockeye executive signed the agreement on February 8, 2022, and an
Empire executive signed it on February 9, 2022.  *See* Docket No. 180-8 at 22.  In any
event, the Court finds that the distinction between the two dates is immaterial.  The
Court deems this fact to be admitted.

Sockeye terminated the License Agreement with Modern on March 14, 2022, stating that it wished to "evolve [its] partnership with a new company."  Docket No. 210 at 8, ¶ 20.[12]

### B. <u>Sockeye and Modern's Conduct During the Time their Contract was in Effect</u>

After signing the License Agreement with Modern, Sockeye sent Modern Class II Big Bear Poker software to test, to demonstrate to casinos, and for installing in gaming cabinets.  *Id.* at 7, ¶ 6.[13]  Modern then gave Sockeye feedback on the software, and Sockeye implemented those changes.  *Id.*  In 2020, Modern developed marketing materials for Big Bear Poker both for its own use and Sockeye's use.  *Id.*, ¶ 7.[14]  On May 6, 2021, BMM Test Labs approved Big Bear Poker's software on Modern's dual screen cabinet.  *Id.*, ¶ 11.[15]  In early 2022, Modern installed Big Bear Poker units at the

---

[12] Sockeye disputes this fact in part, stating that, "[o]n or about February 22, 2022, Sockeye notified Modern of the Empire License and said that it would continue to work with Empire on Modern's behalf.  Modern became upset, telling Sockeye that it wanted to be bought out of the Agreement.  Sockeye agreed to this. . . .  Sockeye formally sent the notice of termination on March 14, 2022."  Docket No. 233 at 4-5, ¶ 20.  The Court finds this to be nonresponsive to Modern's asserted fact regarding what Sockeye said to Modern on March 14, 2022 when Sockeye terminated the agreement.  The Court deems this fact to be admitted.

[13] Sockeye disputes this fact in part, stating that, "[d]espite the PDS being tendered 'as is,' Modern 'require[d]' Sockeye conform the PDS to a dual-screened cabinet. . . .  Modern's citations do not all concern Big Bear Poker."  Docket No. 233 at 3, ¶ 6.  The Court finds this to be nonresponsive to Modern's asserted fact.  The Court deems this fact to be admitted.

[14] Sockeye disputes this fact in part, stating that "Modern cites to 'a very rough draft of the flyer graphic.' ('[A]ll Sockeye info should be replaced with Modern.').  None of this changes the scope of the Agreement itself."  Docket No. 233 at 3, ¶ 7 (internal citations omitted).  The Court deems this to be nonresponsive to Modern's asserted fact.  Sockeye's response also includes legal argument regarding the implications of the fact.  The Court deems this fact to be admitted.

[15] Sockeye states that this fact is "[a]dmitted in part. The May 6 approval referred to an updated version."  Docket No. 233 at 4, ¶ 11.  It is not clear to the Court what distinction Sockeye is attempting to draw.  The Court deems this fact to be admitted.

testing lab for the WinStar's tribe, with technical support from Sockeye.  *Id.* at 8, ¶ 14.[16]
Sockeye told Empire that Modern was pursuing Big Bear Poker placements at Poarch
Creek.  *Id.*, ¶ 17.

## II.  LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when
the "movant shows that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson
v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A disputed fact is "material" if,
under the relevant substantive law, it is essential to proper disposition of the claim.
*Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  Only disputes
over material facts can create a genuine issue for trial and preclude summary judgment.
*Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is
"genuine" if the evidence is such that it might lead a reasonable jury to return a verdict
for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

Where "the moving party does not bear the ultimate burden of persuasion at trial,
it may satisfy its burden at the summary judgment stage by identifying a lack of
evidence for the nonmovant on an essential element of the nonmovant's claim."
*Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quotations
omitted).  "Once the moving party meets this burden, the burden shifts to the nonmoving
party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works of
Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994).  The

---

[16] Sockeye disputes this fact in part, stating that "Modern sent the incorrect
version of Big Bear Poker."  Docket No. 233 at 4, ¶ 14.  The Court finds this
nonresponsive to Modern's asserted fact that Sockeye supported Modern in installing
BBP at the WinStar testing lab.  The Court deems this fact to be admitted.

nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quotations omitted). "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman*, 252 F.3d at 1115. When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.*

## III. ANALYSIS

### C. <u>Motion for Summary Judgment</u>

Sockeye moves for summary judgment on each of Modern's three claims against Sockeye: breach of contract, promissory estoppel, and civil conspiracy. Docket No. 180 at 2.

#### 1. *Breach of Contract*

Modern alleges that Sockeye breached the License Agreement when it terminated the agreement on March 14, 2022. Docket No. 118 at 17, ¶¶ 77-81. Sockeye argues that it is entitled to summary judgment on this claim because Modern cannot prove an essential element of the claim – damages. Docket No. 180 at 7. Specifically, Sockeye asserts that the License Agreement did not provide Modern with the right to distribute Big Bear Poker and that therefore Modern suffered no damages when Sockeye provided the Big Bear Poker distribution rights to Empire. *Id.* at 7-8.

Resolution of this issue depends upon an interpretation of the License Agreement. Contract interpretation is a question of law to be resolved by the court. *See, e.g., Echo Acceptance Corp. v. Household Retail Servs., Inc.*, 267 F.3d 1068, 1080 (10th Cir. 2001) ("In general, the interpretation of a contract is a question of law.")

(citing *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1313 (Colo. 1984)).

Colorado courts[17] apply traditional principles of contract interpretation. *Cotter Corp. v.
Am. Empire Surplus Lines Ins. Co.*, 90 P.3d 814, 819 (Colo. 2004); *Essex Ins. Co. v.
Vincent*, 52 F.3d 894, 896 (10th Cir. 1995). Courts are to give effect to the intent of the
parties and to enforce the contract's plain language unless it is ambiguous. *Hoang v.
Assurance Co. of Am.*, 149 P.3d 798, 801 (Colo. 2007). A "court should interpret a
contract 'in its entirety with the end in view of seeking to harmonize and to give effect to
all provisions so that none will be rendered meaningless.'" *Copper Mountain, Inc. v.
Industrial Systems, Inc.*, 208 P.3d 692, 697 (Colo. 2009). If the language of the contract
is unambiguous, a court will enforce the plain meaning of the contract's terms. *Est. of
Christensen v. Vail Mountain View Residences Phase II, LLC*, 2025 WL 869636, at *3
(Colo. App. Mar. 20, 2025).

Both parties offer reasons why they believe the language of the contract supports
their respective positions. Docket No. 180 at 7-10; Docket No. 210 at 9-14. However,
both parties also argue that, in the event that the Court finds there to be ambiguities in
the contract, extrinsic evidence also supports their views. Docket No. 180 at 10-11;
Docket No. 210 at 14-15.

Sockeye's motion for summary judgment on Modern's breach of contract claim
hinges on its argument that the License Agreement does not grant Modern a license to
distribute Big Bear Poker. Docket No. 180 at 7. The licensing section in the agreement

---

[17] Modern and Sockeye do not dispute that Colorado law governs Modern's
claims against Sockeye. Moreover, the License Agreement states that the agreement
and "performance hereunder" is governed by Colorado law. See Docket No. 210-4 at
17, § 13.10.

states that "Licensor hereby grants to Licensee and its Authorized Users a license to
use the PDS as indicated in this Agreement and subject to the terms of this Agreement."
Docket No. 210-4 at 5, § 2.1.  The Licensor is Sockeye, whereas the Licensee is
Modern.  *Id.* at 2.  That section also states that Modern may "redistribute GDS solely as
incorporated and used with the PDS to Gaming Venue Operators . . . for commercial
purposes."  *Id.* at 5, § 2.3(b).  PDS is the "Platform Development Software" created by
Sockeye that is "utilized in developing Gaming Device Software."  *Id.* at 2, § 1.4.  GDS,
"interoperates" with the PDS and together the GDS and PDS "is approved for
commercial release by a gaming laboratory."  *Id.* at 3, § 1.5.  Although the Licensing
agreement contains definitions for "Game Unit," "Gaming Application," and "Game
Software," *id.*, §§ 1.7, 1.10, 1.11, each of these terms defines a game that consists of
GDS that is interoperable with PDS.  Thus, the Court interprets the License Agreement
to grant a license to Modern to use Sockeye's PDS and GDS for Sockeye's games.

Sockeye, however, argues that, while the "Agreement granted Modern an
exclusive license only to use the PDS and, by extension, the GDS," the games
themselves are not part of the PDS or the GDS.  Docket No. 180 at 9  Sockeye instead
claims that "the Agreement explicitly excludes Gaming Applications from the definition
of PDS."  *Id.*  However, Sockeye provides no textual support for its argument other than
referring to the definition of PDS, which states that PDS "does not include the game
specific features and functionality that may change from Gaming Application to Gaming
Application."  Docket No. 210-4 at 2-3, § 1.4.  The fact that the definition of PDS
excludes the game specific features that vary from game to game says nothing about
GDS.  Pursuant to the License Agreement, GDS varies game to game and it is that

software, combined with the PDS, that is tested by a gaming laboratory for approval for commercial release.  Docket No. 180 at 3, ¶ 7.  While Sockeye attempts to distinguish between GDS and the term "Gaming Application," which is defined as "any application that can be used in the commercial . . . Gaming Industry to place a wager," Docket No. 210-4 at 3, § 1.10, there is no such distinction in the License Agreement.  A Gaming Application is a combination of the PDS and a game-specific GDS.[18]  The License Agreement, as Sockeye concedes, grants Modern a license to use both PDS and GDS.[19]  Moreover, the compensation section of the License Agreement ties the license fee to the number of Gaming Units placed by Modern in various locations, reinforcing the fact that Modern's license includes GDS.  *Id.* at 4, 7, §§ 1.24, 3.

The fact that the License Agreement grants Modern a license to place gaming units in casinos and other locations does not answer the question of whether the License Agreement grants Modern a license to place Big Bear Poker in such locations.  In fact, the phrase "Big Bear Poker" does not appear anywhere in the License

---

[18] Sockeye argues that the negotiations between Sockeye and Modern before signing the License Agreement "lend support" to Sockeye's interpretation of the License Agreement not to include a license to use Gaming Applications.  Docket No. 180 at 10.  However, because the Court finds no ambiguity in the terms that grant a license to Modern, the Court will not consider this argument.

[19] Sockeye suggests that Modern only paid $100 for its exclusive right to use the PDS, which is inconsistent with an agreement to license Sockeye's gaming applications.  Docket No. 180 at 1.  However, the language that Sockeye relies on is simply a standard consideration clause.  On the first page of the License Agreement, the agreement states that, "in consideration of the foregoing premises, the mutual covenants of the parties contained herein, $100 paid in had by Licensee to Licensor, and for other good and valuable consideration, . . . the parties agree as follows."  Docket No. 210-4 at 2.  The heart of the compensation provisions is that Modern agrees to pay to Sockeye an "IP License Fee" of $9.00 per day per Gaming Unit per location on a quarterly basis.  Docket No. 210-4 at 4, 7, §§ 1.24, 3.  Contrary to Sockeye's argument, the compensation provisions of the Agreement are consistent with Sockeye having granted Modern a license to place Sockeye gaming units in casinos.

Agreement.  Docket No. 180 at 4, ¶ 13.  To explain this silence in the License

Agreement, both sides cite extrinsic evidence.

Sockeye's argument regarding a license for Big Bear Poker focuses on Modern's

rejection of an initial contract proposed by Sockeye.  Docket No. 180 at 10.  However,

the emails discussing the June 13, 2019 contract proposed by Sockeye do not mention

Big Bear Poker, and this silence is similarly ambiguous.  *See* Docket No. 180-4 at 2-5.

Sockeye also relies on the agreement between Sockeye and Empire.  *Id.* at 10-

11.  This agreement was signed on February 8, 2022.  *Id.* at 5, ¶ 18.  The Court finds

that the Empire agreement is not useful in interpreting the contract between Sockeye

and Modern.  The Empire agreement involves different parties and was executed over

two years after the Sockeye-Modern License Agreement.  More importantly, it was

executed at a time when both Sockeye and Empire had an incentive to distinguish their

agreement from the Sockeye-Modern License Agreement, perhaps with an awareness

of possible legal issues.  As such, the Court finds it is of little value in identifying the

intent of Sockeye and Modern at the time they executed the License Agreement.

Regarding extrinsic evidence, Modern cites evidence that, after the License

Agreement was signed, Sockeye was aware of and actively supported Modern in

distributing Big Bear Poker to prospective clients.  Docket No. 210 at 14.  Modern

prepared marketing materials about Big Bear Poker for its own use and for Sockeye's

use.  *Id.* at 7, ¶ 7.  Sockeye provided technical support for Modern in setting up Big Bear

Poker games for the testing lab at the Winstar casino.  *Id.* at 8, ¶ 14.  Sockeye informed

Empire that Modern was pursuing Big Bear Poker placements at Poarch Creek.  *Id.*,

¶ 17.

"A contract is ambiguous if it is 'fairly susceptible' to more than one interpretation."  *SolidFX, LLC v. Jeppesen Sanderson, Inc.*, 935 F. Supp. 2d 1069, 1086 (D. Colo. 2013) (applying Colorado law).  Although the Court interprets the License Agreement to include Sockeye's PDS and GDS, the agreement is silent as to which games Modern has a license to use.  The Court cannot resolve the critical contract interpretation issues raised by the parties based on the plain language of the License Agreement's terms, but instead will look to extrinsic evidence in interpreting the contract.  *See, e.g.*, *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Fed. Ins. Co.*, 213 F. Supp. 3d 1333, 1340 (D. Colo. 2016), *aff'd*, 734 F. App'x 586 (10th Cir. 2018).  In undertaking this examination of extrinsic evidence, the Court keeps in mind the primary goal of contract interpretation, which is "to determine and give effect to the intent of the parties."  *Ad Two, Inc. v. City & Cnty. of Denver ex rel. Manager of Aviation*, 9 P.3d 373, 376 (Colo. 2000).

"[T]he subsequent conduct of parties frequently makes plain the intent with which a previous act was performed."  *Gunderson v. Weidner Holdings, LLC*, 2023 WL 12058983, at *3 (Colo. App. June 8, 2023); *see also CATV Servs., Inc. v. Arguss Commc'ns, Inc.*, 194 F. App'x 547, 554 (10th Cir. 2006) (applying Colorado law and noting that the course of performance could be relevant in interpreting a contract term).

Moreover, "Colorado law permits a written contract to be modified by the parties' course of performance."  *La Plata Open Space Conservancy v. Baker*, 2025 WL

274558, at *4 (Colo. App. Jan. 23, 2025) (citing *Woods v. Monticello Dev. Co.*, 656 P.2d 1324, 1327 (Colo. App. 1982)).[20]

The Court finds that the course of performance by Modern and Sockeye after the execution of the License Agreement indicates that both parties believed that Modern had the right to place Big Bear Poker in casinos.  Thus, the Court will interpret the License Agreement's references to PDS and GDS to include a license for Modern to use Big Bear Poker.  In the alternative, even if the course of conduct does not resolve the contract interpretation issue, the Court finds that the course of performance, which involved collaborative efforts by Modern and Sockeye to place Big Bear Poker, was so pervasive that, to a reasonable person, the actions spoke louder than the words of the anti-waiver clause.  Therefore, the provision in the contract which provides Modern with a license to "install GDS onto Gaming Units utilizing the PDS," Docket No. 180 at 3, ¶ 5, includes a license for Big Bear Poker.  The Court finds that Sockeye's basis for seeking summary judgment on the breach of contract claim – that Modern never had the right to distribute Big Bear Poker – fails.  The Court will therefore deny this portion of Sockeye's motion for summary judgment.

### 2. *Promissory Estoppel*

Sockeye seeks summary judgment on Modern's claim for promissory estoppel. Docket No. 180 at 11-12.  In response, Modern states that it "agrees to dismiss that

---

[20] Even when a contract contains an anti-waiver provision, as the License Agreement does, *see* Docket No. 210-4 at 16, §§ 13.4, 13.5, the course of performance may modify the agreement.  *See La Plata Open Space Conservancy*, 2025 WL 274558, at *4 (citing *Woods*, 656 P.2d at 1327).  However, for a course of conduct to modify the contract, the conduct must be "so pervasive that in the eyes of a reasonable [person] it 'spoke louder than [the] word' . . . of the 'anti-waiver' clause, which in effect counseled against reliance on conduct indulging default."  *Id.*

claim if the Court finds the License Agreement grants Modern the right to place
Sockeye's Class II Big Bear Poker software.  But if the Court disagrees, summary
judgment is not warranted on this claim."  Docket No. 210 at 2.  The Court has now
found that the License Agreement granted Modern the right to distribute Big Bear Poker.
In light of the Court's finding and Modern's statement, the Court will dismiss with
prejudice Modern's promissory estoppel claim.

### 3.  Civil Conspiracy

Sockeye seeks summary judgment on Modern's claim for civil conspiracy.
Docket No. 180 at 13-15.  Sockeye's first argument is that civil conspiracy is a derivative
cause of action and that, because Modern "has not asserted any underlying tort claim,
much less provided any evidence of a viable a tort claim against Sockeye," the civil
conspiracy claim must fail.  *Id.* at 13.

To establish a civil conspiracy claim, Modern must show 1) an object to be
accomplished, 2) an agreement by two or more persons on a course of action to
accomplish that object, 3) in furtherance of that course of action, one or more unlawful
acts which were performed to accomplish a lawful or unlawful goal, or one or more
lawful acts which were performed to accomplish an unlawful goal, and (4) damages to
the plaintiff as a proximate result.  *Fifth Third Bank v. Morales*, No. 16-cv-01302-CMA-
STV, 2017 WL 6492108, at *6 (D. Colo. Dec. 19, 2017) (citing *Magin v. DVCO Fuel
Sys., Inc.*, 981 P.2d 673 (Colo. App. 1999)).

A civil conspiracy claim is "derivative in nature."  *Girardi v. Kovacs*, 2017 WL
11931560, at *13 (Colo. App. Apr. 13, 2017) (citation omitted).  A civil conspiracy claim
must therefore be "substantiated by an independent cause of action – the wrongful acts
alleged must establish an independent cause of action in order to sustain a cause of

action for civil conspiracy arising from those same acts." *Id.* Colorado law does not, however, require that a defendant charged with civil conspiracy commit the underlying tortious act. *See AMG Nat'l Corp. v. Wright*, No. 20-cv-02857-PAB-KAS, 2024 WL 1299100, at *8 (D. Colo. Feb. 13, 2024), *report and recommendation adopted*, 2024 WL 1436292 (D. Colo. Mar. 4, 2024). Modern's civil conspiracy claim is predicated on a meeting of the minds between Sockeye and Empire to accomplish the unlawful goals of interfering with Modern's existing and prospective contractual relationships. *See* Docket No. 118 at 18-19, ¶¶ 90-91. As the Court has now dismissed Modern's claims against Empire for tortious interference, *see* Docket No. 254 at 22, there remains no underlying wrong to support Modern's civil conspiracy claim.[21] Modern's civil conspiracy claim

---

[21] Modern's response, in a footnote, argues that it has sufficient evidence to support viable tort claims against Sockeye for "intentional interference with contractual and prospective business relationships." Docket No. 210 at 16 n.6. It is not clear whether Sockeye's motion meant to argue that Modern's civil conspiracy claim failed solely for the lack of a tort claim against Sockeye or if it failed for lack of tort claims against either Sockeye or Empire. There are issues with both parties' arguments. Sockeye appears to argue that, if the civil conspiracy claim relied only on underlying tortious conduct by Sockeye, then Modern would need to asset a freestanding tort claim in its complaint against Sockeye. *See* Docket No. 180 at 13. This argument fails, however, as a freestanding tort claim is not required to support a civil conspiracy claim. *See Mighty Argo Cable Car, LLC v. Trivecta Cap. Grp., Inc.*, No. 21-cv-01106-RMR-NRN, 2022 WL 4115690, at *4 (D. Colo. Sept. 9, 2022), *report and recommendation adopted*, 2022 WL 8166234 (D. Colo. Sept. 23, 2022) ("Though a civil conspiracy claim requires underlying tortious conduct, Plaintiff need not specifically plead the underlying tortious conduct as a separate cause of action. So long as the factual allegations would support a tort claim, the civil conspiracy claim can proceed."); *White River Vill., LLP v. Fid. & Deposit Co. of Maryland*, No. 08-cv-00248-REB-MEH, 2013 WL 6168853, at *6 (D. Colo. Nov. 25, 2013); *Cavitat Med. Techs., Inc. v. Aetna, Inc.*, No. 04-cv-01849-MSK-OES, 2006 WL 218018, at *5-6 (D. Colo. Jan. 27, 2006). Modern, meanwhile, argues that it has evidence of tortious interference with contract against Sockeye. *See* Docket No. 210 at 16 n.6. Under Colorado law, however, one party to a contract cannot maintain a claim against another party to the contract for tortious interference with that contract. *See MDM Grp. Assocs., Inc. v. CX Reinsurance Co. Ltd.*, 165 P.3d 882, 886 (Colo. App. 2007).

therefore fails, and the Court will grant Sockeye's motion for summary judgment on this claim.

### D. **Motion to Dismiss**

Sockeye filed a motion to dismiss Modern's civil conspiracy claim.  Docket No. 143.  The motion to dismiss makes the same arguments as the motion for summary judgment.  *Compare* Docket No. 143 at 6-10 *with* Docket No. 180 at 13-15.  As the Court has addressed these arguments in its ruling on the motion for summary judgment, the Court denies as moot the motion to dismiss.

## IV.  CONCLUSION

It is therefore

**ORDERED** that Sockeye Software Inc.'s Motion for Summary Judgment on Modern Gaming Inc.'s Breach of Contract and Conspiracy Claims [Docket No. 157] is **DENIED as moot**.  It is further

**ORDERED** that Sockeye Software Inc.'s Amended Motion for Summary Judgment on Modern Gaming Inc.'s Breach of Contract and Conspiracy Claims [Docket No. 180] is **GRANTED in part and DENIED in part**.  It is further

**ORDERED** that Modern's second claim for relief, which asserts a promissory estoppel claim against Sockeye, is **DISMISSED with prejudice**.  It is further

ORDERED that Modern's third claim for relief, insofar as it asserts a civil conspiracy claim against Sockeye, is **DISMISSED with prejudice**.  It is further

ORDERED that Sockeye Software's Motion to Dismiss Modern's Conspiracy

Claim [Docket No. 143] is **DENIED as moot**.

DATED January 13, 2026.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge